UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TLA-HOLBROOK LLC,<br><br>                Plaintiff,<br><br>     v.<br><br>TOWN OF HOLBROOK, MASSACHUSETTS, TOWN OF HOLBROOK SELECT BOARD, TOWN OF HOLBROOK PLANNING BOARD, TOWN OF HOLBROOK CONSERVATION COMMISSION, CATHERINE GOLDRICK, PATRICIA CONWAY, PAMELA CAMPANELLA, WILLIAM CONRAD, CHRISTOPHER EDDINGTON, KIMBERLY ALLARD, ERIC HELFER, RICHARD COOMBS, FRANK DUGGAN, JOHN RUSSO, BRIAN LUTZ, and ZACHARY KONTRA individually and in their official capacity as current or former agents or officials of the Town of Holbrook; and KEVIN COSTA, DAVID REILLY, WILLIAM WATKINS, CHRISTOPHER GOLDEN, BRIAN DONOVAN, CHRISTOPHER LADE, FRED WHITE, and WILLIAM FORTE in their official capacity as current or former agents or officials of the Town of Holbrook,<br><br>                Defendants. | Case No. _____ |

**COMPLAINT**

TLA-Holbrook LLC ("TLA") seeks to construct a much-needed municipal solid waste transfer station in Holbrook, Massachusetts, and brings this action to address the concerted conduct of Holbrook politicians and municipal board members to thwart TLA's lawful efforts to construct this critical infrastructure. This action follows nearly two decades of exhaustive permitting efforts, good-faith cooperation, and repeated accommodations, during which

Defendants engaged in egregious bad-faith conduct, including pretextual denials of routine permits for independent political gain. Specifically, TLA seeks to secure redress for the Defendants' violations of TLA's federally granted civil rights, enforce its rights under contract, and obtain compensation for the taking of its real property: the site to construct and operate a 1,000 tons-per-day transfer station anticipated to be worth in excess of $75 million in profits over its operating life.

This is far more than a routine zoning disagreement. TLA entered into a binding Lease and Host Community Agreement with the Town of Holbrook to redevelop a contaminated parcel at 3 Phillips Road (the site of the former Holbrook Chemical Company and now owned by Holbrook through a tax taking) and build a modern municipal solid waste transfer facility at 1, 3, and 6 Phillips Road. Under the Lease Agreement, which residents of Holbrook broadly supported through multiple town-wide votes, the Town would receive substantial economic and community benefits, such as monthly payments tied to facility operations, free residential municipal solid waste services, and remediation of the contaminated property.

TLA worked diligently over many years to secure the state and municipal permits required to develop the proposed transfer station at the site. After receiving those permits – including several from the Town – TLA faced prolonged delay in constructing the Project attributable to events outside its control: TLA successfully defended against multiple abutter appeals brought by the Town of Randolph in both Massachusetts Superior Court and Appeals Court and then faced additional delay while awaiting MassDEP's issuance of the Authorization to Construct.

When MassDEP finally issued the Authorization to Construct and TLA was prepared to begin work, the Town's posture shifted as local politics turned from supportive to obstructive.

2

TLA's project became a central campaign issue for Town of Holbrook Select Board candidates, and several candidates ran, and won, on platforms expressly and strongly opposed to the Project.

What followed was not an even-handed or fair review of TLA's applications for required municipal permits. The Town's boards refused reasonable extension requests for previously issued approvals, forcing TLA to reapply for permits for substantially the same Project. TLA was then subject to drawn-out, illegal, unfair, and inconsistent treatment at the hands of the Holbrook Conservation Commission and Holbrook Planning Board, all instigated by the Select Board. For example, after a total of 18 public hearings and four site walks, the Commission denied TLA's application for a wetlands permit, despite its prior approval of the same Project only a few years earlier. The Commission improperly and arbitrarily denied TLA's permit application for reasons that completely disregarded the substantial and unrebutted expert evidence TLA provided.

The Planning Board followed a similar pattern: holding 10 public hearings, receiving extensive expert opinions, and requiring TLA to submit written responses to more than 150 questions, many of which were duplicative or already answered in TLA's application materials. Despite TLA proposing conditions that the Planning Board previously agreed to in 2019, the Planning Board denied TLA's site plan application, claiming TLA applied for the wrong permit.

The Town itself also escalated its efforts to stop TLA's project development. On April 4, 2025, it sent a letter to TLA purporting to terminate the Lease Agreement, asserting it was "no longer valid," even though it had been in place and relied on by the parties without objection for nearly 16 years, and despite express, contractual limitations on the Town's termination rights. Trying to understand the Town's new opposition to its Project, TLA submitted a public records request regarding inter-board communications about the Project, to which the Town projected it had more than 20,000 responsive documents. Despite good-faith efforts to narrow its request, to

3

date, the Town has failed to meet its production deadlines and provide TLA with a meaningful substantive response to its request.

These events did not occur in isolation. This treatment was a coordinated and outcome-driven effort, spearheaded by members of the Select Board, who historically opposed the Project and urged the Commission, the Planning Board, and the Town to reject TLA's Project, whether they had legal grounds to do so or not.

Defendants' actions constitute a startling abuse of government power: they coordinated denials of previously granted municipal approvals, imposed unpredictable and overly burdensome permitting requirements, and pressured members of public boards to deny permit applications on pretextual bases, regardless of the evidentiary record, legal standards, and the Town's contractual obligations. TLA brings this action to ensure the protection of its civil rights, enforce the Town's contractual obligations, and obtain just compensation for the illegal taking of its property interests.

## PARTIES

1.      Plaintiff TLA-Holbrook LLC ("TLA") is a Delaware corporation with a principal place of business in Massachusetts located at 40 Shawmut Road, Canton, Norfolk County, Massachusetts 02021.

2.      Defendant Town of Holbrook (the "Town") is a municipality located in Norfolk County, Massachusetts. The Town's address is Holbrook Town Hall, 50 North Franklin Street, Holbrook, Norfolk County, Massachusetts 02343.

3.      Defendant Town of Holbrook Select Board (the "Select Board") is a municipal board of the Town of Holbrook authorized to contract with private parties on behalf of the Town under the Holbrook General By-Laws. The Select Board's address is Holbrook Town Hall, 50 North Franklin Street, Holbrook, Norfolk County, Massachusetts 02343.

4

4.    Defendant Town of Holbrook Planning Board (the "Planning Board") is a municipal board of the Town responsible for reviewing and issuing, among other permits, site plan approvals under the Holbrook Zoning By-Laws. The Planning Board's address is Holbrook Town Hall, 50 North Franklin Street, Holbrook, Norfolk County, Massachusetts 02343.

5.    Defendant Town of Holbrook Conservation Commission (the "Commission") is a municipal board of the Town of Holbrook with responsibility for reviewing and issuing orders of condition under the Holbrook Wetlands Protection By-Laws and the Massachusetts Wetlands Protection Act, M.G.L. c. 131, § 40. The Commission's address is Holbrook Town Hall, 50 North Franklin Street, Holbrook, Norfolk County, Massachusetts 02343.

6.    Defendant Patricia Conway is the Chair of the Select Board and is named individually and in her official capacity. Ms. Conway resides at 1 Westdale Road, Holbrook, Norfolk County, Massachusetts 02343.

7.    Defendant Catherine "Katie" Goldrick is the Clerk, and former Chair, of the Select Board and is named individually and in her official capacity. Ms. Goldrick resides at 18 Johns Avenue, Holbrook, Norfolk County, Massachusetts 02343.

8.    Defendant Kevin Costa is the Vice-Chair of the Select Board and is named in his official capacity. Mr. Costa resides at 8 S Shore Road, Holbrook, Norfolk County, Massachusetts 02343.[1]

9.    Defendant Pamela Campanella is a member of the Select Board and is named individually and in her official capacity. Ms. Campanella resides at 16 Spring Lane, Holbrook, Norfolk County, Massachusetts 02343.

---

[1] TLA names the Select Board, Planning Board, and Commission members in their official capacity and only lists members in their personal capacity for whom it has information or belief that they directed or participated in the collusive efforts to violate TLA's fundamental rights.

10. Defendant David Reilly was a member of the Select Board in 2023 and is named in his official capacity. Mr. Reilly resides at 71 Juniper Road, Holbrook, Norfolk County, Massachusetts 02343.

11. Defendant William Watkins was a member of the Select Board in 2023 and is named in his official capacity. Mr. Watkins resides at 11 W Shore Road, Holbrook, Norfolk County, Massachusetts 02343.

12. Defendant Christopher J. Lade is a member of the Select Board, was a member of the Planning Board from 2021 to 2025, and is named in his official capacity. Mr. Lade resides at 101 Abington Avenue, Holbrook, Norfolk County, Massachusetts 02343.

13. Defendant Brian Donovan was a member of the Planning Board from 2018 to 2024 and Chair of the Planning Board from 2024 to 2025 and is named in his official capacity. Mr. Donovan resides at 109 Roberts Avenue, Holbrook, Norfolk County, Massachusetts 02343.

14. Defendant Eric Helfer is the Vice-Chair of the Planning Board and is named individually and in his official capacity. Mr. Helfer resides at 81 Blair Road, Holbrook, Norfolk County, Massachusetts 02343.

15. Defendant Christopher Eddington is the Chair of the Planning Board and is named individually and in his official capacity. Mr. Eddington resides at 52 Linfield Street, Holbrook, Norfolk County, Massachusetts 02343.

16. Defendant Kimberly A. Allard is the Clerk of the Planning Board and is named individually and in her official capacity. Ms. Allard resides at 440 Weymouth Street, Holbrook, Norfolk County, Massachusetts 02343.

17.     Defendant Christopher Golden was the Chair of the Planning Board in 2023 and is named in his official capacity. Mr. Golden resides at 3 Kenmar Drive, Holbrook, Norfolk County, Massachusetts 02343.

18.     Defendant William Conrad is a member of the Planning Board, was formerly a member and Chair of the Commission from 2023 to 2025, and is named individually and in his official capacity. Mr. Conrad resides at 78 Stevens Drive, Holbrook, Norfolk County, Massachusetts 02343.

19.     Defendant Richard Coombs is a member of the Commission and is named individually and in his official capacity. Mr. Coombs resides at 28 E Shore Road, Holbrook, Norfolk County, Massachusetts 02343.

20.     Defendant Frank Duggan is a member of the Commission and is named individually and in his official capacity. Mr. Duggan resides at 155 Belcher Street, Holbrook, Norfolk County, Massachusetts 02343.

21.     Defendant John Russo is the Vice-Chair of the Commission and is named individually and in his official capacity. Mr. Russo resides at 15 Orchard Street, Holbrook, Norfolk County, Massachusetts 02343.

22.     Defendant Brian Lutz is a member of the Commission and is named individually and in his official capacity. Mr. Lutz resides at 26 Sherrick Avenue, Holbrook, Norfolk County, Massachusetts 02343.

23.     Defendant Zachary Kontra is a member of the Commission and is named individually and in his official capacity. Mr. Kontra resides at 19 Cottage Street, Holbrook, Norfolk County, Massachusetts 02343.

24.    Defendant Fred White is the Chair of the Commission and is named in his official capacity. Mr. White resides at 34 Elm Avenue, Holbrook, Norfolk County, Massachusetts 02343.

25.    Defendant William Forte is a former member and Chair of the Commission in 2023 and is named in his official capacity. Mr. Forte resides at 1 Hamilton Way, Holbrook, Norfolk County, Massachusetts 02343.

## JURISDICTION AND VENUE

26.    This Court has subject matter jurisdiction over federal civil rights claims under 42 U.S.C. § 1983, and supplemental jurisdiction over state law claims under 28 U.S.C. § 1367(a).

27.    This Court is the proper venue for this matter pursuant to 28 U.S.C. § 1391 because the Town of Holbrook and the property in dispute are located in the Commonwealth of Massachusetts.

28.    This Court has personal jurisdiction over the parties because each has its principal place of business or is domiciled in Massachusetts.

## FACTUAL ALLEGATIONS

### The Town of Holbrook Seeks Development of Waste Transfer Station

29.    In 2005, members of the Holbrook Select Board approached Jack Walsh and Mike Gustin following their launch of Champion City Recovery, a construction and demolition waste transfer facility, located in nearby Brockton, Massachusetts.

30.    Based on the success of the Champion City project, the Select Board members sought to discuss the prospect of developing a municipal solid waste transfer station at 3 Phillips Road, Holbrook (the "Project").

31.    3 Phillips Road is located in the Town's Industrial Zoning District near the intersection of Phillips Road and Mear Road on the west side of Holbrook, with the

8

Massachusetts Bay Transit Authority's commuter rail to the west, the Baird & McGuire Superfund Site to the south, the Cochato River to the east, and industrial properties along Phillips Road to the north.

32.    At that time, 3 Phillips Road was owned by the Holbrook Chemical Company, a defunct corporation that owed substantial real estate taxes. The Select Board was aware of the deteriorated condition of 3 Phillips Road, including the need for remediation and the presence of dilapidated, unusable structures.

33.    In order to pursue this project, Mr. Walsh and Mr. Gustin formed Holbrook Environmental Logistic Partnerships ("HELP"), in which they served as managers.

34.    Following a series of discussions and negotiations, HELP and the Town reached an agreement in principle that Holbrook would obtain title to 3 Phillips Road though a tax taking proceeding and then lease that property to HELP for the purpose of building and operating a transfer station.

35.    The property at 3 Phillips Road is a MassDEP-listed contaminated site under the Massachusetts Oil and Hazardous Material Release Prevention and Response Act, M.G.L. c. 21E.

36.    On June 28, 2005, the Commonwealth of Massachusetts awarded the Holbrook Chemical Company's property at 3 Phillips Road to the Town because of unpaid taxes and the Town assumed liability for site clean-up.

37.    The cost of remediation of the contamination at the property has been estimated at approximately $2 million.

38.    On May 15, 2006, at Holbrook's Annual Town Meeting, the Town voted to authorize the Select Board to lease 3 Phillips Road to HELP for the development and construction of a municipal solid waste-by-rail transfer station.

39.    Then, in a townwide referendum, Holbrook residents overwhelmingly voted to authorize the Select Board to negotiate and enter a lease and host community agreement on behalf of the Town for HELP to develop the Project on the Property.

40.    On February 19, 2009, the Select Board entered into the Lease and Host Community Agreement with HELP (the "Lease Agreement"). A true and accurate copy of the Lease Agreement is attached as Exhibit 1.

41.    On March 26, 2009, HELP assigned its leasehold interest to TLA, as permitted by Section 17.1 of the Lease Agreement.

42.    HELP and the Town entered into the Lease Agreement for the express purpose of "constructing and operating a commercial solid waste transfer, management and recycling facility," as stated in Section 2.1 of the Lease Agreement.

43.    Pursuant to Sections 3.1, 3.2, and 6.3 of the Lease Agreement, the lease is for a duration of 20 years, with the right to four successive extensions of five years each, beginning once the transfer station is licensed to operate and accept 1,000 tons of municipal solid waste per day.

44.    Under Section 5 of the Lease Agreement, TLA also accepted the responsibility of remediating the contamination on the Property, including conducting necessary preliminary assessments as required by the Massachusetts Contingency Plan.[2]

---

[2] TLA has diligently advanced the Site through Phases I, II, III, and IV of the Massachusetts Contingency Plan, which includes completion of site investigation, comprehensive assessment, remedy selection, and development of a Remedy Implementation Plan. These efforts reflect TLA's substantial investment in and commitment to achieving regulatory compliance and site remediation.

45.    Section 4.3 of the Lease Agreement states (emphasis added):

*Town agrees to cooperate with Tenant in procuring the Permits and Rail Access, to the extent such cooperation does not constitute a conflict of interest. Town shall review any and all applications for Permits with impartial consideration and in accordance with all applicable statutes and/or bylaws.* Tenant shall assume fully all obligations under any such approvals and permits and releases, hold harmless and indemnify Town from all liabilities thereof except as limited by the last sentence of Section 5.2 hereof. Tenant shall use its commercial good faith and diligent efforts to obtain the Permits and Rail Access within thirty-six (36) months from the Lease Execution Date (the "Permit Period"). The failure of Tenant to obtain the Permits or Rail Access within said Permit Period shall not be grounds for termination of this Lease if the delay is caused by the lack of timely action by any permit granting authority or the appeal of any regulatory decisions or approvals necessary to commence construction and operate the Facility and Tenant diligently prosecutes or defends any such appeals.

46.    Section 4.3 requires the Town to "cooperate" with TLA and act with "impartial consideration" in reviewing TLA's local permit applications.

47.    Furthermore, under Section 4.3, the Town is barred from terminating the Lease Agreement if "the delay is caused by the lack of timely action by any permit granting authority or the appeal of any regulatory decisions or approvals necessary to commence construction."

48.    Section 3.4 of the Lease Agreement states (emphasis added):

Subject to Section 4.3 hereof, the parties agree that if the Permits and Rail Access (defined in Article IV below) have not been obtained within thirty-six (36) months from the Lease Execution Date; if the Facility construction has not been commenced within six (6) months from the date the Permits and Rail Access are obtained; or if the Facility has not been completed within twenty-four (24) months from the date the Permits are obtained, the Town may elect to terminate this Lease upon ninety (90) days' written notice to the Tenant; provided, however, that if the Permits and Rail Access are obtained, the Facility construction is commenced or the Facility has been completed within such ninety (90) day period, whichever is applicable, such termination notice shall be null and void, and this Lease shall continue in full force and effect. *Notwithstanding the foregoing, the Town agrees that it will not seek to terminate the Lease under this Section 3.4 during any period in which the Tenant has made substantial progress towards obtaining the Permits and Rail Access and/or constructing the Facility, and is actively and in good faith seeking final approval of the Permits and Rail Access and/or diligently pursuing completion of the Facility consistent with Section 4.3 hereof.*

11

49.     Thus, pursuant to Section 3.4 of the Lease Agreement, the Town is prohibited from terminating the Lease Agreement during any period in which TLA "has made substantive progress" towards obtaining permits and is "in good faith seeking final approval" of permits.

50.     Section 17.1 of the Lease Agreement allows TLA to assign or sublease the Property with written consent from the Town, which "shall not be unreasonably withheld."

51.     The Town's departments, boards, and committees were made aware of these provisions of the Lease Agreement through TLA's explicit references or attachments to their filings, including in applications to the Planning Board and the Commission.

### The Importance and Economics of Solid Waste Infrastructure

52.     A municipal solid waste transfer station is a critical infrastructure facility that receives municipal solid waste from haulers, then transfers it by rail car to out-of-state disposal or processing facilities. Transfer stations are commonly used to manage the ever-dwindling options for solid waste disposal in Massachusetts and provide lower cost and more efficient options for movement of waste and recycling materials by rail.

53.     The development of a transfer station typically requires significant upfront capital investment in site preparation, permitting, and infrastructure.

54.     Transfer stations generate revenue primarily through "tipping fees," which are fees charged to waste haulers based on the volume or weight of waste delivered to the facility. These tipping fees are a standard industry mechanism for covering operating costs and generating profit.

55.     In addition to tipping fees, transfer stations may generate revenue from service agreements with municipalities or commercial waste generators.

12

56. Because revenue is directly tied to the amount of waste received, transfer stations are economically viable when located in areas with sufficient waste generation and transportation demand, like Massachusetts, which has not permitted a new landfill in the last decade, and projected that "landfill capacity for municipal solid waste . . . [will] decline to *virtually zero* by [2030]."[3]

57. The economic feasibility of such a project depends on long-term site control, predictable and uniform regulatory treatment, and the ability to collect tipping fees over time to recover those capital costs.

58. Pursuant to Section 6 of the Lease Agreement, TLA provided and continues to provide economic benefits to the Town and its residents in the form of monthly payments of $2,000 during the permitting and construction process. After the facility is in operation, TLA will provide "tipping fees" calculated based on the tonnage of waste received and free curbside trash pick-up and recycling drop-off for residents.

59. To date, TLA has paid the Town more than $350,000 under the Lease Agreement. The Town began to reject payments in April 2025, so TLA now deposits those monthly payments into an escrow account.

60. Through the Lease Agreement, TLA reasonably anticipated generating on average over half a million dollars in revenue for the Town each year while in operation over its expected 40-year lifespan.

61. Upon information and belief, based on the number of residents in the Town of Holbrook and the cost of the private municipal trash pick-up for which residents currently pay,

---

[3] Massachusetts Department of Environmental Protection, *2030 Solid Waste Master Plan: Working Together Toward Zero Waste*, at 3 (Oct. 2021), https://www.mass.gov/doc/2030-solid-waste-master-plan-working-together-toward-zero-waste/download (emphasis added).

TLA would save the Town of Holbrook's residents, collectively, over $4 million dollars per year in free trash disposal.

62.    TLA also reasonably expected that the value of the Property once permitted and prior to construction would be in excess of $25 million; with a post-constructed value in excess of $60 million.

63.    The anticipated revenue from tipping fees and related operations formed the economic basis for HELP's proposed investment in the Property. Without the ability to operate a transfer station at 3 Phillips Road, HELP would not have otherwise agreed to remediate the Town's contaminated property.

**TLA Diligently Pursued All Applicable Permits**

64.    Pursuant to the Lease Agreement, TLA began permitting a 1,000 tons-per-day transfer station project at 3 Phillips Road in 2009. Over time, TLA has come to lease two additional parcels of adjacent land to use for the Project at 1 and 6 Phillips Road in Holbrook (collectively with 3 Phillips Road, the "Property"), which are owned by One Phillips Development Trust and Six Phillips Road Trust, respectively.

65.    As discussed below, TLA has diligently sought the necessary permits and approvals for the Project from the Town's municipal boards, including a Site Assignment from the Holbrook Board of Health, Site Plan Approval from the Holbrook Planning Board, a Special Permit from the Holbrook Zoning Board of Appeals, and an Order of Conditions from the Holbrook Conservation Commission. At times, TLA has also required the Holbrook Select Board's approval to file permit applications in its capacity as the owner of 3 Phillips Road. TLA also sought and received permits or approvals from MassDEP, including a Site Suitability Report and Authorization to Construct, as well as a determination from and Massachusetts Executive

14

Office of Energy and Environmental Affair's MEPA Office that the Project did not require further review under the Massachusetts Environmental Policy Act, M.G.L. c. 30, § 61; 310 CMR 11.00 *et seq.*

66.     During the initial permitting of the Project, Holbrook municipal boards worked cooperatively and in accordance with the laws and regulations governing their review of this Project and any project.

67.     However, during this period, the adjacent Town of Randolph opposed the Project and sought to disrupt or defeat TLA's permit applications. Randolph opposed the Project at Holbrook municipal hearings and appealed their decisions. In each instance, Randolph's challenges were defeated in front of municipal permitting authorities and in subsequent appeals to Land Court, Superior Court, and ultimately the Appeals Court.

68.     TLA initially received Special Permits for the Project from the Holbrook Zoning Board of Appeals on September 9, 2009, and again on March 9, 2010.

69.     TLA then began the significant process of obtaining a Site Suitability Report from MassDEP and a Site Assignment from the Holbrook Board of Health.

70.     Under Massachusetts law, developers of a solid waste transfer station must obtain a site assignment pursuant to M.G.L. c. 111, § 150A. This requires an extensive application to MassDEP in which the applicant presents evidence of compliance with 19 site suitability criteria. If the MassDEP agrees that the site is suitable for the proposal solid waste project, it will issue a Site Suitability Report approving the project. The applicant then must apply to the local board of health for its portion of the site assignment process, which includes presenting evidence on the same 19 site suitability criteria. The board of health proceedings are quasi-judicial and include a hearing officer and live cross-examination. *See* M.G.L. c. 111, § 150A; 310 CMR 16.40.

71.     On April 25, 2017, TLA submitted its site suitability application to MassDEP.

72.     After providing public notice, receiving written and verbal public comments, and meeting with Holbrook officials, MassDEP ultimately determined that the site met all relevant criteria, issuing a Report on Suitability for Site Assignment for TLA's Project.

73.     On November 10, 2017, after extensive hearings on the Project's potential impact on public health, safety, and the environment, TLA then received a Site Assignment from the Board of Health that imposed 65 conditions on the Project. A true and accurate copy of the site assignment is attached as Exhibit 2. Though contested on appeal by Randolph, the Massachusetts courts repeatedly affirmed the Holbrook Board of Health's decision to approve the site assignment as valid and supported by substantial evidence. *See generally Town of Randolph Bd. of Health & Town of Randolph v. Town of Holbrook Bd. of Health & TLA-Holbrook LLC*, Dkt. No. 1782-CV-01597, 2021 WL 5113800 (Mass. Super. Ct. Oct. 16, 2020), *aff'd*, Dkt. No. 20-P-1423 (Mass. App. Ct. Oct. 29, 2021).

74.     In 2019, TLA made a minor modification to the Project's design, and, after several detailed hearings, the Board of Health issued a second approval for this Project. A true and accurate copy of the minor modification approval is attached as Exhibit 3.

75.     Because of design changes to the Project throughout the Site Assignment process, TLA was required to file two new Special Permit applications to the Holbrook Zoning Board of Appeals.

76.     These applications were subject to four public hearings and were thoroughly reviewed by Civil and Environmental Consultants, Inc., the peer review engineering consultant for the Holbrook Zoning Board of Appeals and the Town.

77.     On August 13, 2019, the Zoning Board of Appeals unanimously approved TLA's two Special Permits, which remain valid today.

78.     Simultaneously, TLA sought site plan approval from the Planning Board under Section 10.6 of the Holbrook Zoning By-Laws. The Planning Board's review evaluated the Project's land use and design to ensure adequate protection of the Town's cultural, economic, and historic resources, preservation property values, promotion of community attractiveness, and prevention of incompatible or substandard development. Holbrook Zoning By-Laws, § 10.6.1.

79.     Importantly, a site plan approval cannot be denied unless it presents an issue so intractable that it could admit of no reasonable solution—in other words, that no reasonable condition would address that issue.

80.     On August 19, 2019, the Planning Board constructively granted TLA's site plan approval application because the Massachusetts Superior Court found that the Planning Board's decision was untimely filed with the Town Clerk as required by the Section 10.6.13 of the Zoning By-Laws (the "2019 Site Plan Approval"). *See TLA-Holbrook LLC v. Town of Holbrook Planning Bd.*, Dkt. No. 1982-CV-1297 (Mass. Super. Ct. Oct. 16, 2020).

81.     On November 11, 2020, TLA and the Planning Board entered a negotiated Stipulation Regarding Planning Board Conditions for the Project, which included 34 site plan conditions that would govern the Project's development and operation. A true and accurate copy of the stipulation is attached as Exhibit 4.

82.     TLA also sought a permit under the Massachusetts Wetlands Protection Act and Holbrook Wetlands Protection By-Laws because part of the Project is sited within a wetlands buffer zone. *See* M.G.L. c. 131, § 40; 310 CMR § 10.00; Holbrook Wetlands Protection By-Laws, § 11-7.

17

83.    The Massachusetts Wetlands Protection Act is implemented by both MassDEP and local conservation commissions, requiring projects to submit a notice of intent (i.e., a specific application under the Wetlands Protection Act) and comply with the statute, regulations, and local wetlands by-laws. In general, a local conservation commission is the initial permitting authority for a project. The conservation commission holds a public hearing on the notice of intent. In making its decision, a conservation commission must timely issue a permit to the applicant, either approving, conditioning, or denying a project. This permit is called an "order of conditions."

84.    On June 15, 2020, the Commission issued an order of conditions for the Project under DEP File No. 182-0517 (the "2020 Order of Conditions"), including a waiver of Section 4 of the Holbrook Wetlands Protection By-Law (the "Tree By-Law"). The 2020 Order of Conditions was set to expire after three years.

85.    By the end of 2020, TLA was poised to begin construction on the Project as soon as MassDEP issued an Authorization to Construct ("ATC"), subject only to a ministerial building permit.

86.    The ATC application requires full construction plans and drawings that are well beyond the plans and drawings required for local permitting, site suitability, and site assignment. These plans are only drafted after local permitting is complete to reduce the need for costly and time-consuming revisions that may be prompted by changes in the project design during local permitting.

87.    On August 13, 2021, TLA applied to MassDEP for an ATC.

88. By its own regulations, MassDEP is obligated to issue a decision on the ATC within 60 days of the close of the public comment period. 310 CMR § 4.10(4)(g)3.e. That deadline was December 26, 2022. *Id.*; 310 CMR § 19.005.

89. Nearly 11 months after MassDEP's deadline had passed, on November 10, 2023, MassDEP finally issued an ATC, one day prior to the expiration of the 2019 Site Plan Approval and several months after the 2020 Order of Conditions expired.

**Holbrook's Politicians Turn Against the Transfer Station Project**

90. At the time the Town's municipal boards initially reviewed and approved the Project, the Town's elected leadership publicly supported the Project or, at minimum, did not openly oppose it.

91. As TLA awaited an ATC from MassDEP, however, the composition of the Town's Select Board materially changed following local elections in which opposition to TLA's Project became a central campaign issue.

92. Upon information and belief, several individuals who currently serve on the Select Board, including Ms. Conway, Ms. Goldrick, and Ms. Campanella, ran for office on platforms that expressly opposed the Project.

93. Upon information and belief, during their respective campaigns, these Select Board members publicly criticized the Project and aligned themselves with organized opposition to it, including through campaign messaging.

94. For example, in an interview with The Patriot Ledger, Ms. Campanella credited her public opposition to TLA's Project as the reason why she won a seat on the Select Board. A true and accurate copy of the article is attached as Exhibit 5.

95.     The Town's posture toward the Project shifted dramatically following the elections of Ms. Campanella, Ms. Conway, and Ms. Goldrick. Extensions of previously approved permits were denied on pretextual grounds. Previously granted permits were denied for the identical project. Select Board members pressured members of other municipal boards to deny projects. The Town sought new lawyers to direct new methods to obstruct the Project.

96.     Even when TLA sought signatures from the Town in their capacity as owner of 3 Phillips Road, such as for requests under the Notices of Activity and Use Limitations (NAULs) to begin remediation of the Property, the Select Board refused to cooperate.

**The Conservation Commission Unjustifiably Reversed its Position on the Project.**

97.      On June 12, 2023, before the 2020 Order of Conditions expired, TLA submitted an extension request to the Commission pursuant to the Wetlands Protection Act and Holbrook Wetlands Protection By-Laws due to the unavoidable delays resulting from MassDEP's late issuance of the Project's ATC. On July 17, 2023, the Commission voted to deny the extension request without a valid legal basis.[4] The Commission did not issue a written decision for their denial.

98.     On November 20, 2024, the Massachusetts Permit Extension Act extended TLA's 2020 Order of Conditions by operation of law for an additional eight months, under which TLA could not have feasibly completed construction of the Project. *See* G.L. c. 238, § 280.

99.     On May 16, 2025, to protect its substantial rights, TLA submitted a second extension request to extend the 2020 Order of Conditions. On June 9, 2025, the Commission again voted to deny the request without or valid legal basis. The Commission did not issue a written decision for their denial.

---

[4] *See TLA-Holbrook LLC v Town of Holbrook Conservation Commission*, No. 23-cv-839 (Mass. Super. Ct. Sept. 6, 2023) (dismissed as moot).

100.    TLA appealed both unlawful extension denials in Massachusetts state court.[5]

101.    In the meantime, TLA pursued a new order of conditions for the Project from the Commission. On September 23, 2023, TLA filed another notice of intent with the Commission under DEP File No. 182-0557 (the "2023 Notice of Intent"), which included substantially the same application materials that were previously approved under the 2020 Order of Conditions.

102.    On October 7, 2024, after 15 public hearings on the Project and three site walks of the Property, the Commission was unable to take a valid vote on the 2023 Notice of Intent because the Commission had failed to ensure that it maintained a quorum of eligible commissioners who had not missed more than one meeting to vote on the project.

103.    TLA and the Commission agreed to allow TLA to withdraw its 2023 Notice of Intent and re-file the same notice of intent and application materials, to ensure that the Commission could legally vote on the Project.

104.    On October 8, 2024, TLA withdrew the 2023 Notice of Intent.

105.    On October 28, 2024, TLA filed with the Commission another Notice of Intent for the same Project under DEP File No. 182-0562 (the "2024 Notice of Intent"), which was substantially the same as the 2020 Order of Conditions and the 2023 Notice of Intent.

106.     The Commission held three more public hearings on the 2024 Notice of Intent on November 18, 2024, December 9, 2024, and January 13, 2025, and a site walk on November 22, 2024.

107.    During these public hearings, TLA re-presented the same application materials for the Project and responded to questions from the Commission and the public.

---

[5] TLA challenged the Commission's extension request denials in Massachusetts Superior Court. *See TLA-Holbrook LLC v Town of Holbrook Conservation Commission*, No. 23-cv-839 (Mass. Super. Ct. Sept. 6, 2023) (dismissed as moot); *TLA-Holbrook LLC v Town of Holbrook Conservation Commission*, No. 25-cv-753 (Mass. Super. Ct. July 14, 2025) (pending).

108.    On January 13, 2025, the Commission closed the public hearing and voted 6-to-1 to deny an order of conditions for the Project under both the Massachusetts Wetland Protection Act and the Holbrook Wetlands Protection By-Laws.

109.    On January 31, 2025, the Chair of the Commission mailed to TLA a purported written decision to deny an order of conditions, which was not signed by a majority of the commissioners. A true and accurate copy of the decision is attached as Exhibit 6. The failure of the majority of the Commissions to sign the decision rendered it invalid.

110.    The Commission later, on March 5, 2025, issued another version of its decision. This time it was signed by the required majority of Commissioners but was outside the statutorily required timeframe for issuance of a decision and, therefore, also invalid.

111.    The Commission claimed the Project did not comply with the Massachusetts Wetlands Protection Act because it "WILL alter and adversely affect Resource Areas under the Act . . . and that the work as proposed CANNOT be conditioned to meet the performance standards so as not to have significant or cumulative effects upon the interests of the Act . . . " *See id.,* at p. 3.

112.    TLA appealed the Commission's decision to MassDEP, requesting a Superseding Order of Conditions.

113.    MassDEP issued a Superseding Order of Conditions in favor of TLA on February 6, 2026. A true and accurate copy of the Superseding Order of Conditions is attached as Exhibit 7.

114.    The Commission did not appeal the Superseding Order of Conditions; during the March 16, 2026 Commission hearing, Mr. White, acting as Chair, acknowledged that the

22

decision not to appeal was influenced by town counsel's opinion that an appeal would have a low likelihood of success.

115.    The Commission additionally denied the 2024 Notice of Intent on the basis that the Project does not satisfy the Tree By-Law contained in its local wetland bylaws.

116.    The Tree By-Law at issue states:

> In no case shall more than 50% of the tree cover be removed for any 100-foot long section of Buffer Zone, except in case of hardship where the applicant can demonstrate that no reasonable alternative exists. Tree cover is measured, for purposes of this section, as the basal area of trees with a 5-inch or greater DBH (diameter at breast height).

A true and accurate copy of the Holbrook Wetlands Protection By-Law, § 11-7 is attached as Exhibit 8.

117.    The Commission failed to apply the plain language of the Tree By-Law and instead relied on criteria nowhere in the Holbrook Wetlands Protection By-Law, including speculative, unsubstantiated considerations concerning replanting feasibility, soil conditions, and the perceived ability to grow replacement trees elsewhere on the site:

> TLA's Proposal violates Section 11-7: Section 4, of the Town of Holbrook's By-law, stated above. TLA's Proposal removes more than 50% of the trees for any 100-foot-long section of Buffer Zone.

> Any hardship claim made by TLA that would exempt them from this By-law is also negated, by the fact that there is no space available on the site with soil/water conditions conducive to the growth of healthy specimens of the trees proposed to be removed.

> Exhibit 6, at 8.

118.    The Commission's reliance on such unfounded considerations constituted an unlawful rewriting of the Tree By-Law and an abandonment of the standards adopted by the Holbrook Wetlands Protection By-Laws.

23

119.    The Commission further acted arbitrarily by ignoring substantial, unrebutted expert evidence in the administrative record demonstrating the absence of reasonable alternatives and the necessity of the proposed design for the transfer station to be sited near rail access.

120.    Specifically, TLA provided evidence showing that the location and configuration of the proposed rail infrastructure is dictated by existing rail lines, operational safety requirements, and site constraints, and that no reasonable alternative would reduce tree removal while still allowing the Project to function.

121.    Even under the Commission's incorrect interpretation of the Tree By-Law, the Commission's denial is internally inconsistent and lacks any rational basis because it acknowledges site constraints that prevent successful replanting while simultaneously using those same constraints as grounds to deny TLA an exception based on hardship relief.

122.    The Commission's application of the Tree By-Law in this instance represents a dramatic departure from its prior treatment of this same Project, which included prior approval of tree removal associated with TLA's 2020 Order of Conditions, without any material change in the relevant facts or governing standards.

123.    While the Commission was reviewing and coming to a decision on TLA's Project, the Commission granted an exemption for a different applicant's project that was similarly in violation of the same Tree By-Law.

124.    At least one Commissioner expressed his concern that denying TLA's Project on this basis would be an unfair and inconsistent application of the Tree By-Law.

125.    The Commission's denial reflects an *ad hoc*, selective, and outcome-driven approach to enforcement of the Tree By-Law, rather than a uniform and consistent application of established standards.

126. TLA challenged the Commission's denial under the local wetlands By-Law, which is currently pending before the Superior Court. *See TLA-Holbrook LLC v. Town of Holbrook Conservation Commission*, No. 25-CV-257 (Mass. Super. Ct. Mar. 5, 2025).

127. Following the Commission's denial, the Commission listed TLA on its agenda for its public meeting on February 24, 2025, but did not inform TLA that its project would be discussed.

128. Moreover, the Commission's failure to initially maintain a quorum for the 2023 Notice of Intent was a violation of the Commission's own originating statute, highlighting their failure to cooperate with even the most basic procedures.

129. Upon information and belief, the Commission denied TLA's 2024 Notice of Intent to ensure that the project would not be permitted to proceed, not based on the applicable Tree By-Law or the evidentiary record.

**The Planning Board Arbitrarily Denied TLA's Site Plan Application.**

130. On November 10, 2023, TLA submitted a request to the Planning Board to extend the Project's construction deadline in the 2019 Site Plan Approval due to MassDEP's substantially delayed issuance of the ATC.

131. On December 12, 2023, the Planning Board denied TLA's extension request.

132. The extension request denial forced TLA to file a new site plan approval application (the "2024 Site Plan Application") with the Planning Board on August 12, 2024, which included substantially the same application materials that were previously approved by both local agencies.

133.    The Holbrook Zoning By-Laws required the Planning Board to file its site plan decision or extension with the Town Clerk within 90 days of receiving an application for site plan approval. Holbrook Zoning By-Laws, § 10.6.13.

134.    TLA agreed to three extensions of the Planning Board's site plan review period on November 1, 2024, January 17, 2025, and February 22, 2025, so long as the Planning Board agreed to review the 2024 Site Plan Application in good faith.

135.    The Planning Board held a series of 10 public hearings to consider the 2024 Site Plan Application on September 10, 2024, October 22, 2024, November 4, 2024, November 19, 2024, December 17, 2024, January 21, 2025, January 29, 2025, February 11, 2025, February 25, 2025, and March 4, 2025.

136.    During the public hearings, the Planning Board heard multiple oral presentations by TLA's engineers and experts: Laura Bugay, P.E., of Green Seal Environmental, Inc., the Project's engineer of record; Robert J. Michaud, P.E., of MDM Transportation Consultants, Inc., the Project's traffic engineer; Marc C. Wallace, QEP, INCE, of Tech Environmental, Inc., the Project's air quality, odor, and sound expert; and Luke Mitchell of VHB Engineering, Surveying, Landscape Architecture and Geology, P.C., the Project's fiscal impact analyst.

137.    During the public hearings, TLA responded to questions from the Planning Board and public.

138.    In collaboration with the Project's engineer of record, TLA laboriously provided the Planning Board with more than 150 written responses to numerous – often duplicative – questions following the hearings. Many of these questions asked for information contained in TLA's original application or repeated previously asked and answered questions. Additionally, TLA often directed the Planning Board to corresponding pertinent information in the 2024 Site

26

Plan Application or supplemented the 2024 Site Plan Application with material necessary for the record.

139.    The Project also received a third-party's review on behalf of the Planning Board from Susan E. Carter, P.E., LEED AP, of PLACES Associates, Inc. ("PLACES"). PLACES also engaged Dr. Kim Eric Hazarvatian, Ph.D., P.E., P.T.O.E., of TEPP LLC to review TLA's expert report and analysis on traffic. Dr. Hazarvatian agreed with the findings of TLA's traffic analysis.

140.    TLA paid for the Planning Board's third-party reviewers, consistent with typical practice.

141.    The Planning Board received written comment letters and heard oral reports about the Project from PLACES.

142.    TLA's engineer addressed all comments raised by PLACES to its satisfaction.

143.    On February 11, 2025, TLA provided the Planning Board with a set of proposed conditions to the site plan approval, which included all conditions previously approved by the Planning Board under its 2019 Site Plan Approval.

144.    The proposed conditions were the primary focus of the last two public hearings on February 25, 2025 and March 4, 2025.

145.    On February 24, 2025, February 26, 2025, and March 4, 2025, TLA and the Planning Board exchanged detailed revisions to the proposed site plan conditions.

146.    After numerous hearings on TLA's 2024 Site Plan Application, the Planning Board – for the first time – took the position that TLA had filed the wrong application and should first seek a special permit to obtain a waiver for the Project's hours of operation.

147.    TLA disagreed with the Planning Board's interpretation that the Zoning By-Laws, or General By-Laws, required TLA to obtain a special permit.

27

148.    The Planning Board's *own* third-party reviewer, PLACES, and TLA each suggested that the parties take additional time to assess the legality of the Planning Board's proposition that a special permit was necessary for the Project.

149.    TLA and PLACES alternatively requested that, rather than an outright denial, the Planning Board impose a condition requiring any necessary special permits be obtained prior to commencing work.

150.    The Planning Board rejected both requests.

151.    The Planning Board closed the public hearing and voted three-to-two to deny the 2024 Site Plan Application, instructing TLA to first apply for a special permit from the Planning Board and resubmit another application for site plan approval.

152.    At the final Planning Board hearing on March 4, 2025, Mr. Helfer strongly suggested TLA withdraw its 2024 Site Plan Application.

153.    The Planning Board's decision came more than 200 days after TLA filed the 2024 Site Plan Application, despite the 90-day requirement imposed by the Holbrook Zoning By-Laws.

154.    In their decision, the Planning Board did not identify any intractable issues with the 2024 Site Plan Application, nor did they impose reasonable conditions on the Project.[6]

155.    Upon information and belief, the Planning Board denied TLA's application not based on the applicable review criteria or the evidentiary record, but to ensure that the Project would not be permitted to proceed.

---

[6] TLA challenged the Planning Board's denial, which is currently pending before the Land Court. *See TLA-Holbrook LLC v. Town of Holbrook Planning Board et al.*, No. 25-MISC-000224 (RBF) (Mass. Land. Ct. Mar. 28, 2025).

**The Town Unlawfully Attempted to Terminate the Lease Agreement.**

156.    On January 29, 2025, during a continuation of a public hearing without TLA present, the Planning Board expressly stated the Lease Agreement was valid and legally binding.

157.    At this meeting, Planning Board members acknowledged that – at the Select Board's request – the Town's counsel, David DeLuca of Murphy, Hesse, Toomey, & Lehane, LLP, reviewed the Lease Agreement and confirmed its validity.

158.    During the January 29, 2025 Planning Board hearing, Ms. Allard acknowledged "I know [TLA is] not here to discuss it . . .  I mean, I get that we're bound to this Host Agreement. I also get that agreements are broken. . .  I can't co-sign someone's bad decision." [7] Ms. Allard further stated she was "not looking to play dirty pool, *but* there is a provision in that Lease Agreement that said they had three years to get their permits and if they didn't the agreement is null and void. Maybe there is something better." Ms. Allard looked to Ms. Goldrick and said, "I mean, that is the Select Board, right?" *Id.* at 2:11-2:12 (emphasis added).

159.    In response to a Planning Board member's clarification that Town counsel already "reviewed and confirmed" the Lease Agreement was "still valid," Ms. Allard looked to Ms. Goldrick and said "well, maybe we need to find a different opinion." *Id.* at 2:13. Ms. Goldrick responded, "good point." *Id.*

160.    At the same January 29 hearing, Ms. Goldrick said she was "so proud" of the Planning Board for its critical review of the Project, expressed disdain for the Lease Agreement, and asked the Planning Board to consider those factors when making its decision.

161.    In addition, Mr. Conrad of the Commission made a public comment that he hoped would inspire the Planning Board to deny the Project's permit and the Select Board to terminate

---

[7] *See* Town of Holbrook Planning Board: 1/29/25, at 2:08-2:09, https://reflect-holbrook.cablecast.tv/CablecastPublicSite/show/5716?site=1.

the Lease Agreement, stating: "Short but hopefully inspirational . . . I think we just got to buck up and figure out what we gotta do to try to stop them. I know it's gonna be tough. I mean, this is 20 years in the making."[8]

162.    Upon information and belief, the Town then sought alternative legal counsel that would agree to further the Select Board's goal of terminating the Lease Agreement and stopping the Project's development.[9]

163.    On April 4, 2025, the Town sent a letter to TLA terminating the Lease Agreement in its entirety, asserting that the Lease Agreement was "no longer valid." A true and accurate copy of the letter is attached as Exhibit 9.

164.    The Town's letter does not refer to Section 3.4 of the Lease Agreement, nor does it refute that TLA "has made substantial progress towards obtaining . . . and is actively and in good faith seeking" the necessary approvals for the Project as required under Section 3.4.

165.    On April 23, 2025, TLA promptly responded to the Town's letter explaining that the Lease Agreement was legally valid when it was executed and remains valid, and that the Town's actions constituted a breach of contract. A true and accurate copy of the response letter is attached as Exhibit 10.

166.    Meanwhile, under M.G.L. c. 40A, § 17 and the Holbrook Zoning By-Laws, TLA appealed the Planning Board's decision to deny the 2024 Site Plan Application as unlawful and in bad faith, seeking declaratory relief and damages from the Massachusetts Land Court. *See supra* ¶ 154 note 6.

---

[8] Town of Holbrook Planning Board: 1/29/25, at 2:22:00-2:23:00, https://reflect-holbrook.cablecast.tv/CablecastPublicSite/show/5716?site=1. TLA can have a transcript of this hearing prepared at the Court's request.

[9] Town of Holbrook Planning Board: 1/29/25, at 2:08:00-2:13:00, https://reflect-holbrook.cablecast.tv/CablecastPublicSite/show/5716?site=1.

167.    During the pendency of this appeal, at an open Select Board meeting on July 2, 2025, the Select Board discussed the pending Land Court action and expressed a need for a letter "regarding the TLA situation." The Select Board moved for Ms. Goldrick to write the letter "outlining why it's not in the best interest of Holbrook to have TLA present, incorporating, health, financial, and other relevant matters." A true and accurate copy of the Select Board minutes is attached as Exhibit 11.

168.    Ms. Goldrick submitted an affidavit in support of the Planning Board's Cross-Motion for Summary Judgment in the Land Court,[10] stating the Lease Agreement "no longer meets the needs of the Town or its residents." A true and accurate copy of the affidavit is attached as Exhibit 12.

169.    The Planning Board's Cross-Motion for Summary Judgment reiterated the claims in the Select Board's April 4, 2025 letter and argued that the Lease Agreement is void.

170.    In its opposition response, TLA pointed out that Ms. Goldrick was not a signatory to the Lease Agreement, she improperly inserted the Select Board's current motives into the Lease Agreement, and that regardless, her individual views cannot serve as a substitute for the collective vote of the Town in 2008. The affidavit also included several factual inaccuracies, which TLA raised in the Land Court.

171.    As of the date of this filing, the Land Court matter remains pending before the court on cross-motions for summary judgment.

---

[10] Defendants' Memorandum in Support of their Opposition to TLA-Holbrook LLC's Motion for Partial Summary Judgment and Defendants' Cross-Motion for Summary Judgment, *TLA-Holbrook LLC v. Town of Holbrook Planning Board et al.*, No. 25-MISC-000224 (RBF) (Mass. Land. Ct. Mar. 28, 2025).

**The Select Board Pressured the Town's Local Boards to Block TLA's Project.**

172.    Within a few months of each other, the Commission denied the 2024 Notice of Intent, the Planning Board denied the 2024 Site Plan Approval, and the Select Board attempted to terminate the Lease Agreement.

173.    Together, these actions signaled a drastic departure from the Town's previous endorsement of the Project and collectively show the coordinated efforts between the Defendants to deny TLA's Project.

174.    At a public hearing before the Commission, on March 25, 2024, Mr. Forte, who was the Chair of the Commission at the time, expressed serious concern about other boards' interference with TLA's Project and the outcome of the Commission's proceeding.

175.    Laura Bugay, TLA's project engineer, further confirmed coordination among the Town's local boards after speaking directly with Mr. Forte and Mr. White, the current Chair of the Commission. A true and accurate copy of Ms. Bugay's sworn affidavit recounting these conversations is attached as Exhibit 13.

176.    In a telephone call with Ms. Bugay, Mr. Forte confirmed his comments during the March 25, 2024 public meeting about board interference were directed at the Select Board.

177.    According to Mr. Forte, the Select Board devised a plan "stomp out" TLA's Project, primarily driven by two new members who were vehemently "anti-transfer station."

178.    Mr. Forte ultimately left the Commission as a result of this interference and collusion by the Select Board.

179.    The Select Board then intentionally filled the Commission with appointed individuals who opposed TLA's Project.

32

180.    According to Mr. White, the Select Board and the Commission had multiple closed-door conversations, which he describes as "collusion." During these meetings, the Select Board repeatedly urged the Commission to deny the Project.

181.    Ms. Goldrick, as the Select Board Chair in 2024, pushed Mr. Conrad, the Commission Chair in 2024, to deny TLA's Project.

182.    The Select Board also pressured Mr. Frank Duggan, a member of the Commission, to vote against TLA's Project using Mr. Duggan's need for municipal approval of his own project in Holbrook, Massachusetts as leverage against him.

183.    At a Commission hearing on October 9, 2024, Mr. Conrad admitted to discussing TLA's Project with the Select Board outside appropriate public channels, and recognized that in doing so, he committed a "faux pas."

184.    At that time, it was common for the Chair of the Commission and the Chair of the Select Board to act without permission of their respective boards.

185.    In a concerted effort to influence the Planning Board and the Commission's decision-making process, Ms. Goldrick, Ms. Conway, and Ms. Campanella, attended the Planning Board and Commission hearings and publicly opposed the Project. These individuals addressed matters outside their professional expertise, often making illogical, unfounded comparisons and claims in a manner that appeared intended to inflame public sentiment and exert undue pressure on the Planning Board and the Commission.

186.    At the end of the Planning Board hearing on January 29, 2025, the Planning Board continued to deliberate the Project and the Lease Agreement without TLA present. At this meeting, members of the Select Board and Commission made public comments in opposition to

33

the Project. None of these conversations or comments were recorded in the Planning Board's meeting minutes.

187.     At this hearing, Ms. Goldrick of the Select Board participated in conversations related to the Lease Agreement's value to the Town, praised the Planning Board for its critical questioning of the Project, and stated: "We know this [Project] will affect us for generations, if we do accept this."[11]

188.     In addition, while the Project was pending before the Planning Board, Mr. Eddington, outside of public hearings and his fellow Planning Board members, sought affirmation from Ms. Conway on denying TLA's application for site plan approval, stating "[w]ith ConCom denying. I'm assuming the PB should cancel the TLA request."  A true and accurate copy of this text message exchange is attached as Exhibit 14.

189.     Ms. Goldrick, Ms. Conway, and Ms. Campanella publicly campaigned for their positions on the Select Board based on their opposition to TLA's Project. *Supra* ¶¶ 91-93.

190.     Ms. Goldrick, Ms. Conway, and Ms. Campanella also exerted pressure through messaging disseminated on social media platforms, such as Facebook.

---

[11] Town of Holbrook Planning Board: 1/29/25, at 2:13:00, https://reflect-holbrook.cablecast.tv/CablecastPublicSite/show/5716?site=1.

191.    For instance, Ms. Conway posted the following on Facebook:



192.    Posts, such as this one, go well beyond neutral discussion of land use policy and instead framed the Project as something the Commission and the Planning Board should defeat.

193.    Upon information and belief, Ms. Goldrick, Ms. Conway, and Ms. Campanella also opposed TLA's Project in a private Facebook group.[12]

---

[12] Stop Holbrook Transfer Station, Facebook Page, https://www.facebook.com/groups/764218747118366 (last visited Feb. 11, 2026).

194.    On September 22, 2025, TLA submitted a public records request to the Town

regarding inter-board communications between members of the Select Board, Planning Board,

Commission, and other municipal employees related to TLA's Project. A true and accurate copy

of the request is attached as Exhibit 15.

195.    The Town estimated it had more than 20,000 responsive documents, revealing

extensive communication between the boards. The Town estimated that responding to TLA's

request would cost $25,000 and take more than 1,000 hours. A true and accurate copy of the

response is attached as Exhibit 16.

196.    The Town's extreme cost and time estimates for responding to the request were

meant to impede TLA's collection of information that would be damaging to the Town and other

named Defendants.

197.    Determined to further obstruct TLA's permitting efforts and contrary to the

Town's public records obligations under M.G.L. c. 66 § 10, the Town insisted that it could not

meet its deadline for document production, forcing TLA to further limit the scope of their public

records request to 2,000 documents.

198.    The Town and TLA then agreed that the Town would respond to TLA's public

records request as follows:

- By January 9, 2026, the Town agreed to review 1,000 documents and produce any that were deemed responsive to TLA's request, including any documents with lawful redactions and a privilege log.

- By January 30, 2026, the Town agreed to review an additional 500 documents and produce any that were deemed responsive to TLA's request, including any documents with lawful redactions and an updated privilege log.

- By February 16, 2026, the Town agreed to review all remaining documents and produce any that were deemed responsive to TLA's request, including any documents with lawful redactions and an updated

36

privilege log, and to produce any other records necessary to complete TLA's request.

199.    The Town failed to comply with the production timelines: it ignored the January 30 and February 16 deadlines and TLA's multiple requests for status reports. To date, the Town has only produced 352 documents.

200.    The Town, Select Board, Planning Board, Commission, and certain members of those boards deliberately conspired to violate and violated TLA's civil rights, breached the Lease Agreement, and took TLA's property without just compensation, all in furtherance of the politically motivated goal of preventing TLA from developing its legal Project.

## COUNTS

201.    All counts herein are pled in the alternative.

### COUNT I — SUBSTANTIVE DUE PROCESS
**(Against the Town of Holbrook, and Kevin Costa, David Reilly, William Watkins, Christopher Lade, Brian Donovan, Christopher Golden, Fred White, William Forte in their Official Capacity, and Patricia Conway, Catherine Goldrick,  Pamela Campanella, Eric Helfer, Christopher Eddington, Kimberly Allard, William Conrad, Richard Coombs, Frank Duggan, John Russo, Brian Lutz, Zachary Kontra in their Individual and Official Capacity)**

202.    TLA incorporates by reference each and every allegation set forth above as if set forth fully here.

203.    TLA has a property interest in its leases at 1, 3, and 6 Phillips Road, including the right to use and enjoy each property for a lawful purpose for which all requisite permits had previously been issued that is protected by the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

204.    As a lessee, TLA is entitled to the right to use and enjoy these properties.

205. Acting under color of state law, the Town and members of the Planning Board, Commission, and Select Board deprived TLA of its protected property interests through conduct that was conscience-shocking in violation of the Fourteenth Amendment.

206. This conduct included but is not limited to:

a. Reversing prior permit approvals without any material change in law or facts;

b. Imposing shifting, inconsistent, and pretextual requirements;

c. Conducting proceedings in a hostile and adversarial manner, constituting a fundamental procedural irregularity that deprived TLA of any meaningful opportunity for fair consideration; and

d. Instituting delays by failing to hold a quorum and failing to read application materials.

207. Collectively, the actions of the Town and members of the Planning Board, Commission, and Select Board constituted a systemic denial of process for TLA with a goal of gaining political advantages for blocking the Project. This amounts to an abuse of governmental power so egregious and divorced from legitimate regulatory purposes as to "shock the conscience."

208. Upon information and belief, the Town's actions were undertaken pursuant to a municipal policy or custom with the goal of denying TLA's Project. This policy or custom was instituted and directed by the Select Board, whose members exercised authority over the Town's land-use and contractual affairs, and acted as final policymakers for the Town.

209. Upon information and belief, following public opposition to the Project, the Select Board communicated both openly and improperly behind closed doors with members of

the Planning Board and Commission and made clear that the Town opposed the Project and did not want it to proceed, irrespective of the Project's compliance with applicable regulations.

210.    TLA suffered damages in the form of legal fees, permitting fees, rental payments, and lost profits as a result of the Town's actions.

**COUNT II — EQUAL PROTECTION**
**(Against the Town of Holbrook, and Kevin Costa, David Reilly, William Watkins, Christopher Lade, Brian Donovan, Christopher Golden, Fred White, William Forte each in their Official Capacity, and Patricia Conway, Catherine Goldrick,  Pamela Campanella, Eric Helfer, Christopher Eddington, Kimberly Allard, William Conrad, Richard Coombs, Frank Duggan, John Russo, Brian Lutz, Zachary Kontra each in their Individual and Official Capacity)**

211.    TLA incorporates by reference each and every allegation set forth above as if set forth fully here.

212.    TLA has a property interest in its leases at 1, 3, and 6 Phillips Road, including the right to use and enjoy each property for any lawful purpose including for which all requisite permits had previously been issued that is protected by the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

213.    As a lessee, TLA is entitled to the right to use and enjoy these properties, including as a transfer station as permitted by the Holbrook Zoning By-Laws and Lease Agreement.

214.    Acting under color of state law, the Town and members of the Planning Board, Commission, and Select Board deprived TLA of its protected property interests through intentional and arbitrary discrimination in violation of the equal protection clause of the Fourteenth Amendment.

215.    Upon information and belief, the Town's actions were undertaken pursuant to a municipal policy or custom with the goal of denying TLA's Project. This policy or custom was

39

instituted and directed by the Select Board, whose members exercised authority over the Town's land-use and contractual affairs and acted as final policymakers for the Town.

216.    Upon information and belief, following public opposition to the project, the Select Board communicated both openly and improperly behind closed doors with members of the Planning Board and Commission and made clear that the Town opposed the Project and did not want it to proceed, irrespective of the Project's compliance with applicable regulations.

217.    In response to this direction and pressure from the Select Board, the Planning Board and the Commission treated TLA's applications differently than similarly situated applicants by denying permits that were previously granted for the *exact same project.*

218.    In addition, around the same time period that the Commission was reviewing and coming to a decision on TLA's Project, the Commission granted an exemption for a different applicant's project that was similarly in violation of the same Tree By-Law. At least one Commissioner expressed his concern that denying TLA's Project on this basis would be an unequal application of the Tree By-Law.

219.    Moreover, the Planning Board and the Commission lacked a rational explanation for their unfair treatment of TLA.

220.    Over the course of the Project's history, there have been no material changes to Holbrook's by-laws or standards that would suggest there is a rational basis for the Town's treatment of TLA.

221.    No rational explanation has been given for Defendants' abrupt change in treatment.

222.    Upon information and belief, Defendants acted with malice and/or bad faith toward TLA by subjecting them to overly harsh and burdensome reviews of their permit

40

applications as indicated by the excessive hearings and site walks, unnecessary quorum issues, and duplicative questions asked.

223. Defendants intentionally and wrongfully singled out TLA for adverse treatment based on their bad faith opposition to the Project and Town policy to deny the Project, which amounted to a gross abuse of power by which the Town predetermined that TLA's permit applications would be rejected.

224. TLA suffered damages in the form of legal fees, permitting fees, rental payments, and lost profits as a result of the Town's actions.

**COUNT III — REGULATORY TAKING**
**(Against the Town of Holbrook)**

225. TLA incorporates by reference each and every allegation set forth above as if set forth fully here.

226. TLA has a property interest in its leases at 1, 3, and 6 Phillips Road, including the right to use and enjoy each property for a lawful purpose.

227. TLA's property interest is protected from being "taken for public use, without just compensation" by the Fifth Amendment to the United States Constitution (as applied to state and local actors through the Fourteenth Amendment) and 42 U.S.C. § 1983, and Article 10 of the Declaration of Rights of the Constitution of Massachusetts.

228. The Town violated the Fifth and Fourteenth Amendment and Article 10 by substantially reducing the value of TLA's properties from a multi-million-dollar transfer station to an empty lot, such that it amounted to a taking.

229. The Town's extraordinary delay in granting permits for the Project is also a regulatory taking of the Property.

230.    The Town's pretextual decision to block the Project, regardless of the material facts, constitutes a permanent deprivation of the economic value of the Property. Even without the Project, TLA is still responsible for the cleanup of the Property under Chapter 21E and would cost TLA more than $2 million to remediate.

231.    TLA reasonably expected to build a 1,000 ton-per-day transfer station as agreed to between TLA and the Town of Holbrook and memorialized in the Lease Agreement.

232.    TLA reasonably expected that the Project would take 36 months to permit, as approximated by Section 3.4 of the Lease Agreement, and made investment-backed decisions to continue to seek permits from the Town.

233.    Despite expressly contracting with TLA for the operation of transfer station, the Town made an abrupt about-face to thwart the Project.

234.    The Town's coordinated actions to block the Project serve no legitimate purpose and are effectively an unlawful ban on transfer stations in the Town of Holbrook.

235.    The Town's efforts permanently deprive TLA of its Project and, ultimately, amount to a taking of TLA's leased properties altogether.

236.    The Town's unconstitutional taking of TLA's leased properties caused actual harm to TLA by significantly depreciating the value and limiting the usage of their properties.

### COUNT IV — MASSACHUSETTS CIVIL RIGHTS ACT (MCRA)
**(Against Patricia Conway, Catherine Goldrick, Pamela Campanella, Eric Helfer, Christopher Eddington, Kimberly Allard, William Conrad, Richard Coombs, Frank Duggan, John Russo, Brian Lutz, Zachary Kontra each in their Individual Capacity)**

237.    TLA incorporates by reference each and every allegation set forth above as if set forth fully here.

238.    TLA has a property interest in its leases at 1, 3, and 6 Phillips Road, including the right to use and enjoy each property for a lawful purpose for which all requisite permits had

42

previously been issued, that is protected by Articles 1, 2, and 10 of the Declaration of Rights of the Constitution of Massachusetts.

239. Defendants interfered or attempted to interfere with TLA's right to their property by denying and obstructing permits, attempting to terminate the Lease Agreement, and opposing the Project in bad faith.

240. Defendants' interference was an attempt to coerce TLA into abandoning the Project altogether.

241. TLA suffered damages in the form of legal fees, permitting fees, rental payments, and lost profits as a result of the Town's actions.

## COUNT V — BREACH OF CONTRACT
### (Against the Town of Holbrook and the Select Board)

242. TLA incorporates by reference each and every allegation set forth above as if set forth fully here.

243. The Lease Agreement between TLA and the Town of Holbrook is a valid, binding, and enforceable contract.

244. At all times, TLA was ready, willing, and able to perform its duties under the Lease Agreement. TLA substantially performed its contractual duties, including by paying all required monthly lease payments and diligently pursuing the permits necessary to construct and operate the agreed upon transfer station.

245. Section 3.4 of the Lease Agreement strictly limits the Town's ability to terminate the Lease Agreement during any period in which TLA has made substantive progress toward obtaining permits and is acting in good faith to secure final approvals.

246.    The Town, without a valid basis to terminate, attempted to void the Lease Agreement through its April 4, 2025 letter and again in its motion for summary judgment briefing with the Land Court.

247.    By seeking to terminate the Lease Agreement on an unenumerated basis, the Town breached Section 3.4 of the Lease Agreement.

248.    In addition, Section 4.3 of the Lease Agreement requires the Town to cooperate with TLA's permitting efforts and to ensure that permit applications receive impartial consideration.

249.    The Town, acting through its agents, the Select Board, Commission, and Planning Board, breached Section 4.3 of the Lease Agreement by failing to cooperate with TLA's permitting efforts and by interfering with the permitting process.

250.    Specifically, the Town, acting through and at the direction or inducement of the Select Board, improperly influenced the Planning Board and Commission to deny TLA's 2024 Site Plan Approval and 2024 Notice of Intent, respectively.

251.    The Town, through the Commission, further failed to cooperate with TLA's permitting efforts by knowingly convening hearings without a quorum, thereby delaying and obstructing TLA's ability to obtain required approvals by failing to hold the necessary number of voting commissioners.

252.    The Town, through the Planning Board and the Commission, also breached Section 4.3 of the Lease Agreement by failing to exercise impartial consideration in reviewing TLA's permit requests.

253.    Rather than acting as neutral permit-granting authorities, the Planning Board and Commission acted in a manner reflecting bias and predetermined opposition to TLA's Project.

254. The Town's actions constituted material breaches of the Lease Agreement and deprived TLA of the benefit of its bargain.

255. As a direct and proximate result of the Town's breaches, TLA suffered substantial damages, including but not limited to:

   a. Lost profits associated with the approximately forty-year lease term contemplated by the Lease Agreement;

   b. Legal fees and costs incurred in challenging the improper denials of permits; and

   c. Out-of-pocket expenses associated with repeated and duplicative permitting efforts.

256. TLA is entitled to all available remedies at law and in equity, including compensatory damages, consequential damages, attorneys' fees where permitted, and such other relief as the Court deems just and proper.

### COUNT VI — BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against the Town of Holbrook and the Select Board)

257. TLA incorporates by reference each and every allegation set forth above as if set forth fully here.

258. Implied in every contract in Massachusetts, including the Lease Agreement between the Town and TLA, is a covenant of good faith and fair dealing.

259. The Town and Select Board violated TLA's reasonable expectations concerning the obligations of the Lease Agreement.

260. The Town and Select Board's acts or omissions, as set forth above in the above Counts, destroyed or injured TLA's right to "receive the fruits" of the Lease Agreement.

45

261.    Based on the totality of the circumstances, the Town and Select Board acted with a lack of good faith, if not with bad faith, when it failed to uphold its contractual obligations; for example, by failing to conduct impartial reviews of TLA's permit applications, improperly inducing its local boards to deny TLA's permits, unduly delaying or obstructing TLA's permitting activities, and repudiating the Lease Agreement.

262.    The Town and Select Board's breach of the implied covenant of good faith and fair dealing caused damage to TLA, including financial damages as TLA has been forced to incur substantial costs related to its Project permitting.

263.    TLA is entitled to all available remedies at law and in equity as necessary and appropriate.

## COUNT VII — MASSACHUSETTS CONSUMER PROTECTION ACT (CH. 93A)
### (Against the Town of Holbrook)

264.    TLA incorporates by reference each and every allegation set forth above as if set forth fully here.

265.    The Town engaged in trade or commerce by entering into the Lease Agreement with TLA, a business entity, for the Property at 3 Phillips Road.

266.    The Town used unfair or deceptive acts or practices to terminate the Lease Agreement by failing to comply with Section 3.4 which prevents the Town from seeking to terminate the lease if TLA "has made substantial progress towards obtaining . . . and is actively and in good faith seeking" the necessary approvals for the Project.

267.    The Town was motivated by an ulterior motive of denying TLA's Project because of political animus, as demonstrated by the collusion between the Select Board, the Planning Board, and the Commission to block the Project.

268.    The Town's actions caused damage to TLA, including, but not limited to, lost profits anticipated under the Lease Agreement, legal fees and costs from challenging permit denials, and out-of-pocket expenses from permitting efforts.

## COUNT VIII — TORTIOUS INTERFERENCE
**(Against Catherine Goldrick, Patricia Conway, and Pamela Campanella Individually)**

269.    TLA incorporates by reference each and every allegation set forth above as if set forth fully here.

270.    The Lease Agreement between TLA and the Town of Holbrook is a valid, binding, and enforceable contract.

271.    Alternatively, TLA and the Town had an actual business relationship in which TLA made regular payments to the Town, and a prospective business relationship in which TLA would provide monetary and non-monetary benefits to the Town in exchange for use of the Property for the development of its Project.

272.    Ms. Goldrick, Ms. Conway, and Ms. Campanella, using their influence as Select Board members, knowingly induced the Town to sever its contract and/or relationship with TLA.

273.    Ms. Goldrick, Ms. Conway, and Ms. Campanella repeatedly sowed doubt regarding TLA's trustworthiness, made statements that conveyed animus towards TLA, and contributed to unprecedented delays to force the Town to re-evaluate the Lease Agreement.

274.    Upon information and belief, Ms. Goldrick, Ms. Conway, and Ms. Campanella intentionally interfered with TLA's Project through "improper motive or means" by attempting to block the Project for their own political gain and coordinating efforts with the Planning Board and Commission to find a pretextual basis to deny TLA's permits.

275.    Ms. Goldrick, Ms. Conway, and Ms. Campanella also pressured municipal boards to deny permits in an effort to demonstrate that the Project would never be approved, and, thus, the Town should terminate the Lease Agreement.

276.    Ms. Goldrick, Ms. Conway, and Ms. Campanella caused harm to TLA by interfering in TLA's contract and/or business relationship with Town.

277.    This harm included the market value of the Property and Project under the Lease Agreement, monthly lease payments, and all fees and costs associated with challenging the improper permit denials.

## COUNT IX – MASSACHUSETTS CIVIL CONSPIRACY
**(Against Catherine Goldrick, Patricia Conway, Pamela Campanella, Christopher Eddington, Kimberly Allard, Eric Helfer, and William Conrad individually)**

278.    TLA incorporates by reference each and every allegation set forth above as if set forth fully here.

279.    TLA alleges the Defendants engaged in two types of civil conspiracy under Massachusetts law: "concerted action conspiracy" and "true conspiracy."

280.    Ms. Goldrick, Ms. Conway, Ms. Campanella, Mr. Eddington, Mr. Helfer, Ms. Allard, and Mr. Conrad engaged in a concerted action conspiracy when they agreed to act in concert and join together in an unlawful and unfair manner, pursuant to a common plan to violate TLA's civil rights and to tortiously interfere with TLA's contract with the Town to stop the Project's development.

281.    Upon information and belief, each defendant knew, or upon reasonable judgment should have known, about the other Defendants' conduct, the common tortious scheme, and its purpose.

282.    Upon information and belief, each defendant substantially assisted or encouraged the other Defendants to achieve the common plan, knowing that such assistance contributed to

48

the common plan to violate TLA's civil rights and tortiously interfere with TLA's contract and business relationship with the Town.

283. Upon information and belief, members of the Select Board and Commission unlawfully colluded to stop TLA's Project.

284. At the January 29, 2025 Planning Board hearing, without TLA present, Ms. Allard acknowledged the Town was "bound" to the Lease Agreement, and that she "get[s] that agreements are broken." *See supra* ¶ 158, note 7 at 2:08-2:09. Ms. Allard stated she was "not looking to play dirty pool, *but*" immediately followed up with ideas on how get out of the contract while encouraging Ms. Goldrick of the Select Board, who was present at the meeting, to take such action. *Id.* at 2:12-2:13.

285. In response to a Planning Board member's clarification that Town counsel already "reviewed and confirmed" the Lease Agreement was "still valid," Ms. Allard looked to Ms. Goldrick and said "well, maybe we need to find a different opinion." *Id.* at 2:13. Ms. Goldrick responded, "good point." *Id.*

286. At the same January 29 hearing, without TLA present, Mr. Conrad encouraged members of his Commission, Planning Board, and Select Board to stop TLA's Project, stating "*we* gotta buck up and figure out what *we* gotta do to try to stop them." *Supra* ¶ 161, note 8 at 2:23 (emphasis added). Two days later Mr. Conrad issued an unlawful denial of TLA's wetlands permit.

287. As a result, each defendant is jointly and severally liable for the wrongful acts of the other Defendants.

288. Moreover, this combination of Defendants – as leaders and members of the Select Board, Planning Board, and Commission – engaged in a "true conspiracy" because they held a

49

"peculiar power of coercion" over TLA, since they had TLA's business and financial future in their hands, and wrongfully exercised that power to get TLA to stop its transfer station permitting and development activity in the Town.

289.   The Defendants' conspiratorial acts have caused harm to TLA by interfering in TLA's contract and/or business relationship with Town, preventing TLA from developing the Project, enjoying its property rights, and resulting in substantial monetary losses.

290.   This harm includes the market value of the Property and Project under the Lease Agreement, monthly lease payments, and all fees and costs associated with challenging the improper permit denials.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff TLA-Holbrook LLC respectfully requests that this Court enter judgment in its favor and grant the following relief:

### Declaratory Relief

1.   Declare that the Town's April 4, 2025 letter's attempted termination of the Lease and Host Community Agreement is invalid and constitutes a breach of contract and good faith and fair dealing;

2.   Declare that Defendants' actions, policies, and customs as alleged herein violated Plaintiff's rights under the United States Constitution and 42 U.S.C. § 1983;

3.   Declare that the Town's actions effected a taking of Plaintiff's property without just compensation in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Article 10 of the Massachusetts Declaration of Rights;

**Injunctive and Equitable Relief**

4.      Enter preliminary and permanent injunctive relief prohibiting the Town, its boards, officers, agents, employees, and all persons acting in concert with them from:

    a.   Enforcing or giving effect to the purported termination of the Lease Agreement;

    b.   Interfering with Plaintiff's contractual rights under the Lease Agreement;

    c.   Denying or obstructing Plaintiff's permit applications for the Project in violation of constitutional or contractual obligations;

5.      Order specific performance of the Lease Agreement, including compliance with Sections 3.4 and 4.3;

**Monetary Relief Against the Town of Holbrook and Defendants in Their Official Capacity**

6.      Award compensatory damages, including but not limited to lost profits, consequential damages, out-of-pocket costs, and diminution in value of Plaintiff's leasehold interests, in an amount to be determined by the jury;

7.      Award just compensation for the taking of Plaintiff's property interest;

8.      Award multiple damages as permitted under M.G.L. c. 93A, to the extent applicable;

**Monetary Relief Against the Individual Defendants in Their Individual Capacities**

9.      Award compensatory damages in an amount to be determined by the jury;

10.      Award punitive damages as permitted by law;

51

**Fees, Costs and Interest**

11.     Award reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, the

Massachusetts Civil Rights Act (M.G.L. c. 12, § 11I), M.G.L. c. 93A (if applicable), and any

other applicable law;

12.     Award pre- and post-judgment interest as permitted by law;

**Other Relief**

13.     Grant such further relief as the Court deems necessary and proper.

**TRIAL BY JURY IS DEMANDED ON ALL JURY-TRIABLE ISSUES**


TLA HOLBROOK LLC,
By its attorneys,


/s/ Michael S. Campinell
Marc J. Goldstein (BBO# 636228)
Michael S. Campinell (BBO# 693424)
Joseph R. Ruggiero (BBO# 711593)
BEVERIDGE & DIAMOND, P.C.
155 Federal Street, Suite 1600
Boston, MA 02110
(617) 419-2300
mgoldstein@bdlaw.com
mcampinell@bdlaw.com
jruggiero@bdlaw.com


March 23, 2026